REDACTED/PUBLIC VERSION
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS
Docket No. 29
EDWARD M. CHEN, United States District Judge *894 Plaintiff 23andMe, Inc. ("23") has filed suit against three affiliated entities - Ancestry.com DNA, LLC; Ancestry.com Operations Inc.; and Ancestry.com LLC (collectively, "Ancestry") - asserting claims for, inter alia , patent infringement, misleading representations in violation of federal and state law, and a declaratory judgment of no trademark infringement and invalidity of trademark. Currently pending before the Court is Ancestry's motion to dismiss. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby GRANTS in part and DENIES in part Ancestry's motion.
I. DISCUSSION
A. Legal Standard
To survive a [12(b)(6) ] motion to dismiss for failure to state a claim after the Supreme Court's decisions in Ashcroft v. Iqbal , 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and Bell Atlantic Corp. v. Twombly , 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), [a plaintiff's] factual allegations [in the complaint] "must ... suggest that the claim has at least a plausible chance of success." In other words, [the] complaint "must allege 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' "
.... [The Ninth Circuit has] settled on a two-step process for evaluating pleadings:
First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.
Levitt v. Yelp! Inc. , 765 F.3d 1123, 1134-35 (9th Cir. 2014).
Notably,
[t]he plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility 'of entitlement to relief.' "
Iqbal , 556 U.S. at 678, 129 S.Ct. 1937.
In the instant case, Ancestry's 12(b)(6) motion challenges all claims asserted in the operative complaint. Those claims are as follows:
(1) Infringement of the '554 patent.
(2) Misleading representations in violation of the Lanham Act. See 15 U.S.C. § 1125.
*895 (3) Misleading advertising in violation of California Business & Professions Code § 17500.
(4) Unlawful and unfair business practices in violation of California Business & Professions Code § 17200 (based on, "among other things, unfair, deceptive, and misleading advertising about [Ancestry's] DNA tests"). Compl. ¶ 68.
(5) Declaratory judgment of no trademark infringement.
(6) Declaratory judgment of invalidity of trademark.
B. Claim for Patent Infringement
1. Relevant Background
23's claim of patent infringement is predicated on the '554 patent, a copy of which is attached to the complaint as Exhibit 4.
The '554 patent is titled "Finding relatives in a database." The patent specification begins by noting that
[e]xisting genetic ancestry testing techniques are typically based on [DNA] information of the Y chromosome (Y-DNA) or DNA information of the mitochondria (mtDNA). Aside from a small amount of mutation, the Y-DNA is passed down unchanged from father to son and therefore is useful for testing patrilineal ancestry of a man. The mtDNA is passed down mostly unchanged from mother to children and therefore is useful for testing a person's matrilineal ancestry. These techniques are found to be effective for identifying individuals that are related many generations ago (e.g., 10 generations or more), but are typically less effective for identifying closer relationships. Further, many relationships that are not strictly patrilineal or matrilineal cannot be easily detected by the existing techniques.
'554 patent, col. 1:21-35. While not explicit, it is evident (and not disputed) that this specification refers to prior art wherein the described DNA information of individuals are compared to determine common ancestry.
The '554 patent is predicated not on Y-DNA or mtDNA information but rather recombinable DNA information. See '554 patent, col. 2:32-35 (explaining that recombinable DNA is the autosomal DNA and X chromosome DNA). The recombinable DNA of a person's parents
is shuffled at the next generation, with small amounts of mutation. Thus, only relatives will share long stretches of genome regions where their recombinable DNA is completely or nearly identical. Such regions are referred to as "Identical by Descent" (IBD) regions because they arose from the same DNA sequences in an earlier generation. The relative finder technique ... is based at least in part on locating IBD regions in the recombinable chromosomes of individuals.
'554 patent, col. 2:35-43.
The patent specification notes that, "[i]n some embodiments, locating IBD regions includes sequencing the entire genomes of the individuals and comparing the genome sequences," but, in other embodiments, "locating IBD regions includes assaying a large number of markers that tend to vary in different individuals and comparing the markers." '554 patent, col. 2:44-49. One example of such a marker is "Single Nucleotide Polymorphisms (SNDPs), which are points along the genome with two or more common variations." '554 patent, col. 2:59-51. "Long stretches of DNA sequences from different individuals' genomes in which markers in the same locations are the same or at least compatible indicate that the rest of the sequences, *896 although not assayed directly are also likely identical." '554 patent, col. 2:56-60.
Figure 1 of the '554 patent "is a block diagram illustrating an embodiment of a relative finding system." '554 patent, col. 2:61-62. The diagram basically shows that:
(1) user information 110 is received by the relative finder system 102 ;
(2) the relative finder system 102 determines, "based at least in part on the recombinable DNA information of the first user and recombinable DNA information of the second user, a predicted degree of relationship between the first user and the second user"; and
(3) "in the event that the expected degree of relationship between the first user and the second user at least meets [a certain] threshold," the first user at least is notified about the relative relationship with the second user.
'554 patent, abstract; see also '554 patent, col. 2:67-3:27 (describing Figure 1); '554 patent, claim 26 (claiming "[a] system for determining a relative relationship of people who are a common ancestor within a threshold number of generations").[1] "In this example, relative finder system 102 may be implemented using one or more server computers having one or more processors, one or more special purpose computing appliances, or any other appropriate hardware, software, or combinations thereof." '554 patent, col. 2:62-66.
As indicated by the above, there are three critical steps in Figure 1: (1) receiving or obtaining recombinable DNA information; (2) determining a predicted degree of relative relationship based at least in part on a comparison of recombinable DNA information; and (3) notifying a person about the relative relationship. These three steps make up the method claimed at claim 1 of the '554 patent. See '554 patent, claim 1 (claiming "[a] method for determining a relative relationship of people who share a common ancestor within a threshold number of generations," comprising these three steps). However, claim 1 of the '554 patent is not being asserted by 23 in the instant case.
Rather, 23 claims infringement of the following dependent claims only: claims 5, 7-8, 12-14, 17, 22, 31-32, 37-38. See Compl. ¶ 40. Below is the invention claimed in claim 7, one of the main claims at issue in this lawsuit.
7. The method of claim 1 [i.e. , (1) receiving/obtaining recombinable DNA information, (2) determining a predicted degree of relative relationship based at least in part on that information, and (3) notifying person about the relationship] wherein:
determining the predicted degree of relationship between the first user and the second user includes identifying one or more Inheritance by Descent (IBD)[2 ] regions in which a portion of recombinable DNA sequence of the first user and a portion of recombinable DNA sequence of the second user arose from same DNA sequence of an ancestor;
the predicted degree of relationship depends at least in part on an amount of DNA sequence information of the IBD regions;
the amount of DNA sequence information of the IBD regions includes a sum of the lengths of IBD regions, percentage of DNA shared in the IBD regions, or both; and *897 a greater amount of DNA sequence information of the IBD regions indicates a closer predicted degree of relationship.
'554 patent, claim 7 (highlight added).
2. 35 U.S.C. § 101
In the instant case, Ancestry moves to dismiss 23's claim for patent infringement on the ground that the '554 patent is directed to unpatentable subject matter. According to Ancestry, the patent "claims an abstract idea (determining a relative relationship by comparing similarities between DNA), and a law of nature (people who share similar DNA are related)." Reply at 2.
Title 35 U.S.C. § 101 defines what is patent eligible. It provides as follows: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has held that § 101" 'contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable.' " Genetic Techs. Ltd. v. Merial L.L.C. , 818 F.3d 1369, 1374 (Fed. Cir. 2016). "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work.' " Id. "[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." Mayo Collab. Servs. v. Prometheus Labs., Inc. , 566 U.S. 66, 71, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012).[3]
On the other hand, "too broad an interpretation of [the above] exclusionary principle could eviscerate patent law. For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." Id. " '[A]n application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection,' " but "to transform an unpatentable law of nature into a patent-eligible application of such a law, one must do more than simply state the law of nature while adding the words 'apply it.' " Id. at 71-72, 132 S.Ct. 1289 (emphasis in original).
"Patent eligibility under 35 U.S.C. § 101 is a question of law...." Genetic Techs. , 818 F.3d at 1373. The Federal Circuit has "repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." Id. However, the Federal Circuit has also noted that there can be underlying factual questions to a § 101 inquiry - e.g. , "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination." Berkheimer v. HP Inc. , 881 F.3d 1360, 1369 (Fed. Cir. 2018) (adding that "[t]he mere fact that something is disclosed in a piece of prior art ... does not mean it was well-understood, routine, and conventional").
There is a two-step test for patent eligibility under § 101.
The test "distinguish[es] patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." As set forth [by the *898 Supreme Court] in Alice [Corp. Pty. Ltd. v. CLS Bank Int'l , 573 U.S. 208, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014) ]:
First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, what else is there in the claims before us? ... We have described step two of this analysis as a search for an inventive concept - i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.[4 ]
Id. (emphasis added).
With respect to step one, the Federal Circuit has emphasized that " 'it is not enough to merely identify a patent-ineligible concept underlying the claim; we must determine whether that patent-ineligible concept is what the claim is "directed to." ' " Thales Visionix, Inc. v. United States , 850 F.3d 1343, 1349 (Fed. Cir. 2017). In other words, what is the focus of the claim? See BSG Tech LLC v. Buyseasons, Inc. , 899 F.3d 1281, 1288 (Fed. Cir. 2018) (stating that, "[f]or an application of an abstract idea to satisfy step one, the claim's focus must be something other than the abstract idea itself"); see also Accenture Global Servs., GmbH v. Guidewire Software, Inc. , 728 F.3d 1336, 1341 (Fed. Cir. 2013) (indicating that a court must " 'identify and define whatever fundamental concept appears wrapped up in the claim[s]' ").
As for step two, the Federal Circuit has underscored that
[t]he inventive concept ... cannot be furnished by the unpatentable law of nature (or natural phenomenon or abstract idea) itself. That is, ... a claim directed to a newly discovered law of nature (or natural phenomenon or abstract idea) cannot rely on the novelty of that discovery for the inventive concept necessary for patent eligibility; instead, the application must provide something inventive, beyond mere "well-understood, routine, conventional activity." "[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable."
Genetic Techs. , 818 F.3d at 1376. In addition, "[t]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment or adding insignificant post solution activity." Mayo , 566 U.S. at 73, 132 S.Ct. 1289 (internal quotation marks omitted).
a. Step One: "Directed to"
Ancestry argues that, at step one, the relevant claims of the '554 patent are "directed to" a law of nature and/or an abstract idea. 23 disputes such.
In resolving the step one issue, the Court begins with the Supreme Court's 2012 Mayo decision. The patents in Mayo
concern[ed] the use of thiopurine drugs in the treatment of autoimmune diseases, such as Crohn's disease and ulcerative colitis. When a patient ingests a thiopurine compound, his body metabolizes the drug, causing metabolites to form in his bloodstream. Because the way in which people metabolize thiopurine compound varies, the same dose of a thiopurine drug affects different people *899 differently, and it has been difficult for doctors to determine whether for a particular patient a given dose is too high, risking harmful side effects, or too low, and so likely ineffective.
Mayo , 566 U.S. at 74, 132 S.Ct. 1289.
Prior to the patents at issue, "those in the field did not know the precise correlations between metabolite levels and likely harm or ineffectiveness. The patent claims at issue here set forth processes embodying researchers' findings that identified these correlations with some precision." Id. For example, a representative claim covered a method of optimizing therapeutic efficacy consisting of the following steps: (1) administering a thiopurine drug and (2) determining the level of 6-TG in the blood, wherein concentrations above a certain level indicated that the dosage was likely too high and concentrations below a certain level indicated that the dosage was likely too low. See id. Thus, the representative claim essentially stated, e.g. , that, "if the levels of 6-TG in the blood (of a patient who has taken a dose of a thiopurine drug) exceed about 400 pmol per 8x108 red blood cells, then the administered dose is likely to produce toxic side effects." Id. at 77, 132 S.Ct. 1289 (emphasis in original).
At step one, the Supreme Court held that the patent claim was directed to a law of nature - in fact "set forth " a law of nature, "namely, [the] relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective [too low] or cause harm [too high]." Id. at 77, 132 S.Ct. 1289 (emphasis added). The Court added:
While it takes a human action (the administration of the thiopurine drug) to trigger a manifestation of this relation in a particular person, the relation itself exists in principle apart from any human action. The relation is a consequence of the ways in which thiopurine compounds are metabolized by the body - entirely natural processes. And so a patent that simply describes that relation sets forth a natural law.
Id. (emphasis added).
Since Mayo , the Federal Circuit has issued several decisions discussing whether a patent claim is directed to a law of nature or a natural phenomenon.
For example, in Ariosa , the patent inventors "discovered cell-free fetal DNA ('cffDNA') in maternal plasma and serum, the portion of maternal blood samples that other researchers had previously discarded as medical waste." Ariosa , 788 F.3d at 1373. "Applying a combination of known laboratory techniques to their discovery," the inventors "implemented a method for detecting the small fraction of paternally inherited cffDNA in maternal plasma or serum to determine fetal characteristics, such as gender." Id. One of the representative patent claims specifically covered a method for detecting paternally inherited cffDNA in maternal plasma or serum consisting of the following steps: "[1] amplifying the cffDNA contained in a sample of a plasma or serum from the pregnant female and [2] detecting the paternally inherited cffDNA." Id.
At step one, the Federal Circuit stated that the asserted patent claims were
directed to a multistep method that starts with cffDNA taken from a sample of maternal plasma or serum - a naturally occurring non-cellular fetal DNA that circulates freely in the blood stream of a pregnant woman. It is undisputed that the existence of cffDNA in maternal blood is a natural phenomenon.... The method ends with paternally inherited cffDNA, which is also a natural phenomenon. The method therefore begins and ends with a natural phenomenon. Thus, *900 the claims are directed to matter that is naturally occurring.
Id. at 1376.
The court added that the patent specification made clear that the patent claims were "directed to a naturally occurring thing or natural phenomenon" - or technically, as the court later stated, "directed to detecting the presence of a naturally occurring thing or a natural phenomenon, cffDNA in maternal plasma or serum." Id. For example, the "Summary and Objects of the Invention" section noted that it was surprising and unexpected to find that cffDNA was detectable in maternal plasma, which had been a material routinely discarded. Also, "the description of the invention note[d]: '[w]e have demonstrated that foetal DNA is present in the maternal plasma and serum.' " Id. Nonetheless, that discovery did not gainsay the fact that the patent was directed to a naturally occurring matter.
The Federal Circuit's decision in Genetic Technologies also involved a law of nature or a natural phenomenon. There, the inventor of the patent "discovered that certain DNA sequences in coding regions (exons) of certain genes are correlated with non-coding regions (introns) within the same gene, non-coding regions in different genes, or non-coding regions of the genome that are not part of any gene [non-coding regions otherwise known as 'junk DNA']." Genetic Techs. , 818 F.3d at 1372. The inventor also found that the "correlated coding and non-coding regions tend to be inherited together, with only rare shuffling. In other words, the regions are in 'linkage disequilibrium,' meaning that the coding and non-coding regions appear 'linked' together in individuals' genomes more often than probability would dictate." Id. The inventor "concluded that alleles of a particular gene may be detected, using well-established laboratory techniques, not by looking for the coding region of the gene itself but instead by amplifying and analyzing non-coding regions known to be linked to the coding region [i.e. , junk DNA]." Id. A representative patent claim "encompasse[d] methods of detecting a coding region allele by [1] amplifying and [2] analyzing any linked non-coding region, which would be found within the same gene as the coding region, within a different gene, or within an intergenic region." Id. at 1372-73.
At step one, the Federal Circuit found that the patent claim was "directed to the relationship between non-coding and coding sequences in linkage disequilibrium and the tending of such non-coding DNA sequences to be representative of the linked coding sequences - a law of nature." Id. at 1374. The court noted that "[c]laim 1 covers any comparison, for any purpose, of any noncoding region sequence known to be linked with a coding region allele at a multi-allelic locus." Id. It was not limited in scope to, e.g. , "methods of detecting any particular alleles linked to any particular non-coding sequences"; thus, "[c]laim 1 broadly covers essentially all applications, via standard experimental techniques, of the law of linkage disequilibrium to the problem of detecting coding sequences of DNA." Id. at 1374-75 (emphasis added).
The court went on to note that the patent was "quite similar to the claims invalidated in Mayo ": " '[J]ust as the relationship in Mayo was entirely a consequence of the body's natural processes for metabolizing thiopurine, so too is the correlation here (between variations in the non-coding regions and the allele presence in the coding regions) a consequence of the naturally occurring linkages in the DNA sequence.' " Id. at 1375. The Federal Circuit also pointed to Ariosa as an analogous case.
The [ Ariosa ] court found that "the claims are directed to matter that is *901 naturally occurring and that the inventors there did not purport to "create[ ] or alter[ ] any of the genetic information encoded in the cffDNA." The focus of the claimed advance over the prior art was allegedly newly discovered information about human biology: paternally inherited ccfDNA is to be found in maternal blood (using established detection techniques). So too in the present case: the patent claim focuses on a newly discovered fact about human biology (the linkage of coding and non-coding regions of DNA), involves no creation or alteration of DNA sequences, and does not purport to identify novel detection techniques.
Id. at 1375-76. Again, the fact that the patent concerned a newly discovered aspect of biology did not negate the fact that the patent was directed to a naturally occurring matter.
In Cleveland Clinic Foundation v. True Health Diagnostics LLC , 859 F.3d 1352 (Fed. Cir. 2017), the Federal Circuit again found a patent claim was directed to a law of nature or natural phenomenon. The patents in True Health concerned detecting the risk of cardiovascular disease in a patient. "When an artery is damaged or inflamed, the body releases the enzyme myeloperoxidase, or MPO, in response. MPO is an early symptom of cardiovascular disease, and it can thus serve as an indicator of a patient's risk of cardiovascular disease." Id. at 1355. The patents at issue disclosed methods for detecting MPO and correlating the results to cardiovascular risk.
At step one, the Federal Circuit stated that the invention involved " 'seeing' MPO already present in a bodily sample and correlating that to cardiovascular disease. Because the testing patents are based on 'the relation [between cardiovascular disease and heightened MPO levels] that exists in principle apart from human action,' they are directed to a patent-ineligible law of nature." Id. at 1361. "[J]ust like Ariosa , the method starts and ends with naturally occurring phenomena with no meaningful non-routine steps in between - the presence of MPO in a bodily sample is correlated to its relationship to cardiovascular disease." Id. The court underscored that "the asserted claims of the testing patents are directed to the natural existence of MPO in a bodily sample and its correlation to cardiovascular risk rather than to 'a new and useful laboratory technique' for detecting this relationship. Indeed, [the patent holder] has not created a new laboratory technique; rather it uses well-known techniques to execute the claimed method," as expressly stated in the patent specifications. Id.
Finally, in BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litigation v. Ambry Genetics Corp. , 774 F.3d 755 (Fed. Cir. 2014) (hereinafter " BRCA "), the Federal Circuit acknowledged the defendant's argument that the patent at issue was directed to a law of nature or natural phenomenon but declined to reach a holding on that argument because there was an independent reason why step one was satisfied - i.e. , the patent was directed to an abstract idea. The plaintiffs in BRCA owned patents that "cover[ed] compositions of matter and methods relating to the BRCA1 and BRCA2 genes," "mutations of which are linked to hereditary breast and ovarian cancers." Id. at 757. The method claims "involve[d] comparisons between the wild-type BRCA sequences [i.e. , sequences most often found in humans] with the patient's BRCA sequences." Id. at 759.
The defendant argued that " Mayo is directly on point because the method claims here, as there, simply identify a law of nature (the precise sequence of the BRCA genes, and comparisons of the wild-type *902 BRCA sequences with certain mutations of those gene sequences found in the test subject) and apply conventional techniques." Id. at 762. But the Federal Circuit did not decide if Mayo was on point "because the method claims ... suffer from a separate infirmity: they recite abstract ideas." Id.
Here, we treat separately the first paragraphs of claims 7 and 8, which describe the comparison of wild-type genetic sequences with the subject's genetic sequence and correspond to the first step of Alice , and the second paragraphs, which describe the techniques to be used in making the comparisons and correspond to the second step of Alice .
We have already addressed the first paragraphs - the comparison step - in our own 2012 Myriad decision. Claims 7 and 8 at issue here depend from claim 1. Claim 1, which is the first paragraph of claims 7 and 8, is the comparison step. In our 2012 decision, we held that claim 1 was patent ineligible because it claimed an abstract mental process of 'comparing' and 'analyzing' two gene sequences.
We found:
[The] claim thus recites nothing more than the abstract mental steps necessary to compare two different nucleotide sequences: one looks at the first position in a first sequence; determines the nucleotide sequence at that first position; looks at the first position in a second sequence; determines the nucleotide sequence at that first position; determines if the nucleotide at the first position in the first sequence and the first position in the second sequence are the same of different, wherein the latter indicates an alteration; and repeats the process for the next position.
Here, under our earlier decision, the comparisons described in the first paragraphs of claims 7 and 8 are directed to the patent-ineligible abstract idea of comparing BRCA sequences and determining the existence of alterations. The methods, directed to identification of alterations of the gene, require merely comparing the patient's gene with the wild-type and identifying any differences that arise. The number of covered comparisons is unlimited. The covered comparisons are not restricted by the purpose of the comparison or the alteration being detected. Because of its breadth, the comparison step covers detection of yet-undiscovered alterations, as well as comparisons for purposes other than detection of cancer. Even with respect to cancer, the comparisons are not limited to the detection of risk of breast or ovarian cancer.... [A]llowing a patent on the comparison step could impede a great swath of research relating to the BRCA genes, and it is antithetical to the patent laws to allow these basic building blocks of scientific research to be monopolized.
Id. at 763-64.
While Mayo , Ariosa , Genetic Technologies , True Health , and BRCA were all decided against the patent holder on step one, 23 points to several Federal Circuit cases that were decided in favor of the patent holder at step one.
For example, in Rapid Litigation Management v. CellzDirect, Inc. , 827 F.3d 1042 (Fed. Cir. 2016), the patent concerned a process for preserving hepatocytes, a type of liver cell that has a number of attributes useful for testing, diagnostic, and treatment purposes. See id. at 1045-46. Prior to the patent at issue, scientists used cryopreservation techniques to preserve hepatocytes for later use. The inventors of the patent discovered that some fraction of *903 hepatocytes are capable of surviving multiple freeze-thaw cycles. See id. at 1045. The improved preservation process at issue in the patent involved "(A) subjecting previously frozen and thawed cells to density gradient fractionation to separate viable cells from non-viable ones; (B) recovering the viable cells; and (C) refreezing the viable cells." Id.
The Federal Circuit noted that, at step one,
[t]he district court identified in these claims what is called a "natural law" - the cells' capability of surviving multiple freeze-thaw cycles. We need not decide in this case whether the court's labeling is correct. It is enough in this case to recognize that the claims are simply not directed to the ability of hepatocytes to survive multiple freeze-thaw cycles. Rather, the claims of the '929 patent are directed to a new and useful laboratory technique for preserving hepatocytes.... The inventors certainly discovered the cells' ability to survive multiple freeze-thaw cycles, but that is not where they stopped, or is it what they patented. Rather, "as the first party with knowledge of" the cells' ability, they were "in an excellent position to claim applications of that knowledge."
Id. at 1048 (emphasis added).
The court distinguished many of the above cases - including Genetic Technologies , Ariosa , and BRCA - because the "end result of the '929 patent claims is not simply an observation or detection of the ability of hepatocytes to survive multiple-freeze thaws." Id. (emphasis added).
That one way of describing the process is to describe the natural ability of the subject matter to undergo the process does not make the claim "directed to" that natural ability. If that were so, we would find patent-ineligible methods of, say, producing a new compound (as directed to the individual components' ability to combine to form the new compound), treating cancer with chemotherapy (as directed to cancer cells' inability to survive chemotherapy), or treating headaches with aspirin (as directed to the human body's natural response to aspirin ).
Id. (emphasis in original). "[T]he claims are directed to a new and useful process of creating [a] pool [of multi-cryopreserved hepatocytes], not to the pool itself." Id. at 1049 (emphasis added); see also id. at 1050 (stating that "[i]t is the process of preservation that is patent eligible here, not necessarily the end product") (emphasis in original).
Another case on which 23 heavily relies is Thales . There, the patent at issue "disclose[d] an inertial tracking system for tracking the motion of an object relative to a moving reference frame." Thales , 850 F.3d at 1344. The tracking system involved "(1) a first inertial sensor mounted on the tracked object; (2) a second inertial sensor mounted on the moving platform; and (3) an element that uses the data from the two inertial sensors to calculate the orientation of the tracked object relative to the moving platform." Id. at 1348. The novelty of the tracking system was that the inertial sensors did "not use the conventional method of measuring inertial changes with respect to the earth. Instead, the platform ... inertial sensors directly measure the gravitational field in the platform frame," and "[t]he object ... inertial sensors then calculate position information relative to the frame of the moving platform." Id. at 1345.
The lower found the patent claims ineligible because they were "directed to the abstract idea of using laws of nature governing motion to track two objects," id. at 1346, but the Federal Circuit disagreed.
*904 These claims are not merely directed to the abstract idea of using "mathematical equations for determining the relative position of a moving object to a moving reference frame," as the Claims Court found. Rather, the claims are directed to systems and methods that use inertial sensors in a non-conventional manner to reduce errors in measuring the relative position and orientation of a moving object on a moving reference frame.... Just as a natural law can be utilized to create an improved laboratory technique for preserving liver cells, so can the application of physics create an improved technique for measuring movement of an object on a moving platform. Just as claims directed to a new and useful technique for defining a database that runs on general-purpose computer equipment are patent eligible, so too are claims directed to a new and useful technique for using sensors to more efficiently track an object on a moving platform. That a mathematical equation is required to complete the claimed method and system does not doom the claims to abstraction.
Id. at 1348-49 (emphasis added). The court added:
The claims specify a particular configuration of inertial sensors and a particular method of using the raw data from the sensors in order to more accurately calculate the position and orientation of an object on a moving platform. The mathematical equations are a consequence of the arrangement of the sensors and the unconventional choice of reference frame in order to calculate position and orientation. Far from claiming the equations themselves, the claims seek to protect only the application of physics to the unconventional configuration of sensors as disclosed.
Id. at 1349 (emphasis added).
The question is whether this case falls under the Mayo / Ariosa / Genetic Technologies / True Health / BRCA line (Ancestry's cases) or the CellzDirect / Thales line (23's cases). The Court finds Ancestry's cases are more on point.
The '554 patent claims at issue are "directed to" a law of nature because the focus of the claims is a correlation that exists in nature - i.e. , the more recombinable DNA information that is shared between two people, the closer the degree of relationship. That correlation "exists in principle apart from any human action." Mayo , 566 U.S. at 77, 132 S.Ct. 1289. In fact, several of the claims of at issue, in essence, do no more than set forth or describe a law of nature, and thus are comparable to Mayo . Claim 5, for example, clearly falls into this category. See '554 patent, claim 5 (claiming a method for determining a relative relationship where the "determining" step simply involves a comparison of recombinable DNA information). Claim 5 is in all material respects indistinguishable from the patent claims at issue in Genetic Technologies , which focused on the observation and comparison of DNA sequences - occurrences in nature. Similarly, Claim 7 simply directs a comparison of certain regions of the users' recombinable DNA (i.e. , the IBD regions) and then observes that "a greater amount of DNA sequence information of the IBD regions indicates a closer predicted degree of [relative] relationship." '554 patent, claim 7 (method claim); see also '554 patent, claims 31, 37 (describing system and computer program product claims instead of a method claim).[5]
*905 While some claims in the '554 patent involve a bit more than observations or descriptions of a law of nature, see, e.g. , '554 patent, claim 17 (claiming the method of claim 1 "wherein the relative relationship is one of a range of possible relative relationships between the first user and the second user, and wherein notifying includes sending an indication of the range of possible relationships"), they do not do much beyond that; notably, the Federal Circuit has held that "insignificant postsolution activity will not transform an unpatentable principle into a patentable process." Diamond v. Diehr , 450 U.S. 175, 191-92, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981).
23 protests that the focus of the claims is not a law of nature but rather "a new and useful way to identify a relative and the degree of relative relatedness, based on a specific selection and characterization of recombinable DNA." Opp'n at 7. This argument, however, is not persuasive because 23 is basically contending that the invention claimed is a new and useful way of detecting a relative relationship based on DNA patterns which occur in nature; 23's own authority establishes that, where a claim's focus is detecting a law of nature or natural phenomenon, that meets the "directed to" standard at step one. See CellzDirect , 827 F.3d at 1048 (distinguishing, inter alia , Ariosa because the "end result of the '929 patent claims [at issue] is not simply an observation or detection of the ability of hepatocytes to survive multiple-freeze thaws") (emphasis added); see also Ariosa , 788 F.3d at 1376 (stating that the patent claims were "directed to a naturally occurring thing or natural phenomenon" - or rather, "directed to detecting the presence of a naturally occurring thing or a natural phenomenon, cffDNA in maternal plasma or serum"). Furthermore, as Mayo , Genetic Technologies , and True Health demonstrate, even if a patent claims discovery of a particular correlation - and even if that correlation is quantified - the patent still focuses on a naturally occurring phenomenon. Discovering some new fact about nature does not negate the patent's focus on a law of nature.[6]
To the extent 23 relies on Thales , that case is easily distinguishable. There, the claims were clearly not directed to any mathematical formula or equations; rather the equations were, in essence, just a useful tool in the invention claimed. The focus in Thales was instead on an "improved technique" for measuring movement which involved, inter alia , nonconventional placement of sensors. See Thales , 850 F.3d at 1348 (noting that, while the claims use "mathematical equations to determination the orientation of the object relative to the moving reference frame, the equations - dictated by the placement of the inertial sensors and application of laws of physics - serve only to tabulate the position and orientation in this configuration"). The patent in Thales thus went beyond observing a law of nature. In the case at bar, the law of nature (related people share DNA information)
*906 is not a mere tool in a novel application of a law of nature. Rather, the law of nature is the essence and end result of the '554 patent claims at issue.
b. Step Two: Inventive Concept
Because the "directed to" standard at step one has been met, the Court now turns to step two, which examines whether the claims at issue include an inventive concept. Here, as noted above, 23 contends that the claims at issue disclose a new and useful technique for detecting a relative relationship. But ultimately the only means of detecting a relative relationship is comparing the recombinable DNA information; an "instruction to undertake a simple comparison step does not represent an unconventional, inventive application sufficient to make [a] claim patent-eligible." Genetic Techs. , 818 F.3d at 1379 ; see also BRCA , 774 F.3d at 763-64 (noting that the mental process of comparing and analyzing two gene sequences is an abstract concept).
23 disagrees, arguing, for example, that, in claim 7, the inventive concept is using IBD information to determine a relative relationship - more specifically, "by 'summing the DNA lengths of the IBD regions [and/or] percentage of DNA shared in the IBD regions.' " Opp'n at 7. But no unconventional inventive technique is claimed in making the comparison: summing (e.g. , DNA lengths shared in the IBD region) simply reflects the basic and conventional principle that the more DNA information that is shared, the closer the degree of relationship. See '544 patent, claim 7 (providing that "a greater amount of DNA sequence information of the IBD regions indicates a closer predicted degree of relationship"). The actual technique employed in claim 7 is not novel.[7] In this case, the '554 patent does not even quantify the degree of similarity or correlation which informs the analysis. Cf. Mayo , 566 U.S. at 74, 77, 132 S.Ct. 1289 (noting that "[c]laim 1 ... states that if the levels of 6-TG in the blood (of a patient who has taken a dose of a thiopurine drug) exceed about 400 pmol per 8x108 red blood cells, then the administered dose is likely to produce toxic side effects" - i.e. , the claim "set[s] forth processes embodying researchers' findings that identified [such] correlations with some precision"; but ultimately still finding claim patent ineligible as it simply set forth a law of nature).[8] Its methodology is left to a generalized description.
To the extent 23 asserts a broader inventive concept - i.e. , simply using IBD regions in the first place to determine a relative relationship - it still fares no better. That claim 7 focuses on a particular region of DNA not previously used for comparison purposes does not place the claim outside the § 101 exception. 23 does not claim to have discovered IBD regions and, even if it did, the discovery of a law of nature is not protected by the patent laws, as reflected in both Ariosa and Genetic Technologies . See also Ass'n for Molecular Pathology v. Myriad Genetics, Inc. , 569 U.S. 576, 579, 133 S.Ct. 2107, 186 L.Ed.2d 124 (2013) (holding that "a naturally occurring DNA segment is a product of nature and not patent eligible merely because it *907 has been isolated"). Furthermore, the '554 specification indicates that it is an inherent characteristic of IBD regions to contain relative relationship information. See '554 patent, col. 2:36-40 (stating that "only relatives will share long stretches of genome regions where their recombinable DNA is completely or nearly identical[;] [s]uch regions are referred to as 'Identical by Descent' (IBD) regions...."); cf. Mayo , 566 U.S. at 77, 132 S.Ct. 1289 (stating that the relationships between concentrations of certain metabolites in the blood and the effect of a thiopurine drug "exist[ ] in principle apart from any human action"); True Health , 859 F.3d at 1361 (stating that the relationship between cardiovascular disease and heightened MPO levels is one that exists in principle apart from human action).
Finally, to the extent 23 argues that there is a factual dispute here that cannot be resolved at the 12(b)(6), see Berkheimer , 881 F.3d at 1369 (stating that "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination"), that argument is unavailing. In effect, the only alleged unconventional feature of 23's claims is the requirement that specific DNA information be compared to determine a relative relationship "[b]ut this simply restates what [the Court has] determined is [a law of nature or] abstract idea." BSG , 899 F.3d at 1291. Again, even if the '554 patent claims a new discovery of nature, it claims no inventive, unconventional technique in making that discovery or applying it.
Accordingly, the Court concludes that, under the two-step Alice test, the '554 patent claims are patent-ineligible.[9]
C. Claim for Misleading Representations in Violation of the Lanham Act
1. Relevant Background
As alleged in the complaint, Ancestry has made misleading representations on its website. For example:
• On March 29, 2018, Ancestry's website stated that its DNA ancestry test tests "5X MORE REGIONS than other DNA tests." Compl. ¶ 51. 23 asked Ancestry to discontinue the claim but no changes were made to the website through at least April 16, 2018. See Compl. ¶ 52.
• On or about April 17, 2018, Ancestry changed its website. The website still made the claim "5X MORE REGIONS than other DNA tests*" but now included an asterisk footnote. The actual footnote stated: "*5x more regions than MyHeritage, Nat Geo Geno 2.0, and Family Three DNA. 2x more regions than 23andMe." Compl. ¶ 53. 23 maintains that this disclaimer was ineffective because it was "essentially hidden" - "at the end of [the] long web page and in ... small font and color." Compl. ¶ 53.
• On or about April 21, 2018, Ancestry made another change to its website, now making the claim "AncestryDNA provides 5x more detail than other tests*" - with the actual footnote stating, "*5x more regions than MyHeritage, *908 Nat Geo Geno 2.0, and Family Tree DNA. 2x more regions than 23andMe." Compl. ¶ 54. The position of the footnote was moved up. 23 contacted Ancestry again and demanded that Ancestry cease and desist; however, the website stayed the same until about May 3, 2018. See Compl. ¶¶ 55-56.
• On or about May 3, 2018, Ancestry changed its website, returning to the claim "5X MORE REGIONS than other DNA tests*" with the same footnote. The location of the footnote was slightly altered. 23 maintains that the disclaimer is still ineffective - represented "in small print" and with 23's name "buried following other company names." Compl. ¶ 49.
In addition to the above, 23 identifies one other subject on which Ancestry allegedly made misrepresentations on its website. According to 23, Ancestry "ran a perpetual 'sale' of its $ 99 DNA test for 'ONLY $ 79*,' misleading consumers to believe a sale was ongoing, when in fact it was merely a reduced price." Compl. ¶ 58. 23 adds that Ancestry stopped this "misleading advertising only after asked by [23] to desist from such misleading promotions." Compl. ¶ 58.
2. Rule 9(b)
The Lanham Act provides in relevant part that there is civil liability for "[a]ny person who, on or in connection with any goods or service, ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact which ... is likely to cause confusion." 15 U.S.C. § 1125(a)(1)(A). In its motion, Ancestry argues that 23's Lanham Act claim should be dismissed because it is subject to Federal Rule of Civil Procedure 9(b), which provides that, "[i]n alleging fraud ..., a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). According to Ancestry, 23 has failed state the circumstances constituting fraud with particularity - in particular, what was false and why.
As an initial matter, 23 disputes that the Lanham Act claim is subject to Rule 9(b). The Ninth Circuit does not appear to have weighed in "as to whether Rule 9(b) applies to Lanham Act claims," and "district courts in California have split on the issue." Oracle Am., Inc. v. TERiX Comput. Co. , No. 5:13-cv-03385-PSG, 2014 WL 31344 at *10, 2014 U.S. Dist. LEXIS 561 at *35 (N.D. Cal. Jan. 3, 2014). But the better reasoned authority is that, where a Lanham Act claim is predicated on the theory that the defendant engaged in a knowing and intentional misrepresentation, then Rule 9(b) is applicable. See, e.g. , Brosnan v. Tradeline Sols., Inc. , No. C-08-0694 JCS, 2009 WL 1604572 at *5, 2009 U.S. Dist. LEXIS 48262 at *13-14 (N.D. Cal. June 5, 2009) (citing authority for the proposition that, "although Lanham Act claims are not categorically subject to the heightened pleading requirements of 9(b)," where a plaintiff alleges knowing and intentional conduct, Rule 9(b) is applicable); Rise Basketball Skill Dev., LLC v. K Mart Corp. , No. 16-cv-04895-WHO, 2017 WL 2775030 at *3-4, 2017 U.S. Dist. LEXIS 99608 at *9 (N.D. Cal. June 27, 2017) (noting the same). There is no real dispute here that 23 is asserting knowing and intentional misrepresentations on the part of Ancestry. Therefore, the Court must evaluate whether the requirements of Rule 9(b) have been met.
Each alleged misrepresentation must be considered on its own terms.
• On March 29, 2018, Ancestry's website stated that its DNA ancestry test tests "5X MORE REGIONS than other DNA tests." Compl. ¶ 51.
*909 Ancestry contends that it is not clear from the complaint why this statement was allegedly false. But just because the statement simply references "other DNA tests," and does not mention 23 by name specifically, does not mean that Ancestry is immunized from liability. This is because 23 has explicitly alleged that it and Ancestry "are the top two companies in the market." Compl. ¶ 47. That being the case, a reasonable consumer could infer that the representation covers 23 - or at least it is a question of fact whether a reasonable consumer could be misled. Ancestry makes a better argument that it is not clear that the statement was false when made - "the number of regions reflected in [23's] products changed over time." Reply at 10. Ancestry points out that, although this is a 12(b)(6) motion, 23 has provided evidence showing that, in April 2018, 23's own website claimed that its services covered "150+ regions*" but with the asterisk/footnote that 23's "Ancestry Composition update with over 120 additional regions will be coming soon." Docket No. 36-10 (Gaede Decl., Ex. C) (23's website). Thus, as to this representation, Ancestry has a meritorious argument that 23 needs to allege more to comply with Rule 9(b).
• On or about April 17, 2018, Ancestry changed its website. The website still made the claim "5X MORE REGIONS than other DNA tests*" but now included an asterisk footnote. The actual footnote stated: "*5x more regions than MyHeritage, Nat Geo Geno 2.0, and Family Three DNA. 2x more regions than 23andMe." Compl. ¶ 53. Contrary to what Ancestry argues, 23 has alleged enough here to satisfy Rule 9(b). The representation "5X MORE REGIONS than other DNA tests" is false as to 23 because - as conceded in the footnote - Ancestry tests only 2x more regions than 23. And it is a question of fact as to whether a reasonable consumer could be misled because, although the footnote clarifies Ancestry's position with respect to 23, 23 has alleged that the footnote was effectively buried ("at the end of [the] long web page and in ... small font and color"). Compl. ¶ 53.
• On or about April 21, 2018, Ancestry made another change to its website, now making the claim "AncestryDNA provides 5x more detail than other tests*" - with the actual footnote stating, "*5x more regions than MyHeritage, Nat Geo Geno 2.0, and Family Tree DNA. 2x more regions than 23andMe." Compl. ¶ 54. The position of the footnote was moved up. As above, it is a question of fact as to whether a reasonable consumer could be misled, even with the new positioning of the footnote.
• On or about May 3, 2018, Ancestry changed its website, returning to the claim "5X MORE REGIONS than other DNA tests*" with the same footnote. The location of the footnote was slightly changed. As above, it is a question of fact as to whether a reasonable consumer could be misled. See Compl. ¶ 49 (alleging that the disclaimer was ineffective - represented "in small print" and with 23's name "buried following other company names").
• Finally, Ancestry represented (e.g. , on its website, see Compl. ¶ 51) that its DNA test cost $ 99 but that it was running a sale so that a consumer could purchase its services for *910 only $ 79. According to 23, the representation of a sale was false because the sale was "perpetual" or never-ending - i.e. , the reality was that there was no "sale" but that Ancestry had simply reduced the price of its services. Contrary to what Ancestry argues, this provides the who, what, when, where, and why, and therefore there is no Rule 9(b) issue. To the extent Ancestry argues that it did not use the word "sale" on its website but simply struck out $ 99 and replaced it with $ 79, see Reply at 11, it is a question of fact as to how a reasonable consumer would understand the striking out - i.e. , indicating a sale or simply a reduced price.
Accordingly, 23's Lanham Act claim is, for the most part, adequately pled. The Court grants the motion to dismiss the Lanham Act claim only to the extent the claim is based on the March 29, 2018, representation on Ancestry's website. 23 has leave to amend to cure this specific deficiency.
D. Claims for Violations of California Business & Professions Code §§ 17500 and 17200
1. Relevant Background
California Business & Professions Code § 17500 essentially prohibits false or misleading advertising. See Cal. Bus. & Prof. Code § 17500 (addressing "untrue or misleading" advertising "which is known, or which by the exercise of reasonable care, should be known, to be untrue or misleading"). Section 17200 prohibits "unlawful, unfair or fraudulent business act[s] or practice[s] and unfair, deceptive, untrue or misleading advertising." Id. § 17200.
In its third and fourth causes of action, 23 alleges a violation of § 17500 and § 17200, respectively. In the § 17500 claim, 23 cites as misrepresentations that Ancestry's "DNA test provides '5X more regions than other DNA tests' and '5X more detail than other DNA tests.' " Compl. ¶ 64. In the § 17200 claim, 23 does not claim a fraudulent business act or practice but rather only "unlawful and unfair" ones. Compl. ¶ 68. The only unlawful or unfair acts or practices identified by 23 are the "misleading advertis[ements] about Defendants' DNA tests." Compl. ¶ 68.
2. Rule 9(b)
For the §§ 17500 and 17200 claims, Ancestry repeats the same argument that it made above with respect to the Lanham Act claim - i.e. , that the §§ 17500 and 17200 claims are subject to Rule 9(b) and that the Rule 9(b) particularity requirements have not been satisfied. The analysis above is applicable here.
3. Standing
Ancestry argues that, apart from any Rule 9(b) issue, there is an independent ground to dismiss the §§ 17500 and 17200 claims. More specifically, Ancestry asserts that, because these claims essentially claim fraud, 23 is required to allege in its complaint actual reliance on the misrepresentations - and that reliance must be 23's reliance, and not just a consumer's.
Ancestry's argument is persuasive on the § 17500 claim as well as the § 17200 claim to the extent it is based on an unlawful (as opposed to unfair) act or practice. The § 17500 claim is clearly predicated on fraud. As for the § 17200/unlawful claim, as currently pled, it is also based on fraud. See Compl. ¶ 68 (referencing "misleading advertising about Defendants' DNA tests"). Contrary to what 23 suggests in its opposition, nothing in the complaint indicates that the § 17200/unlawful claim is based on patent infringement. See Opp'n at *911 19 (arguing that the patent infringement claim is "not predicated on misrepresentation").
Because both the § 17500 and § 17200/unlawful claims are based on predicated on fraud, actual reliance - more specifically, reliance on the part of 23 - is required. Admittedly,
"[n]o California [state] court has addressed" whether "competitor plaintiffs must plead their own reliance or whether pleading consumer reliance is sufficient for fraudulent business practice claims brought by competitors." [And while] [t]here is a split among district courts sitting in California on this issue, ... the majority view appears to be that a plaintiff must be able to allege its own reliance "rather than the reliance of third parties."
A White & Yellow Cab, Inc. v. Uber Techs., Inc. , No. 15-cv-05163-JSW, 2017 WL 1208384 at *8, 2017 U.S. Dist. LEXIS 49803 at *20-21 (N.D. Cal. Mar. 31, 2017). This makes sense because, "in general, a traditional fraud claim cannot be premised on third-party reliance." Id. at *8, 2017 U.S. Dist. LEXIS 49803 at *21; cf. O'Connor v. Uber Technologies, Inc. , 58 F.Supp.3d 989, 1003 (N.D. Cal. 2014) (in a case where plaintiff alleged a business practice likely to deceive members of the public (as opposed to himself), stating that "third-party reliance is insufficient to establish [plaintiff's] standing under the fraud prong of the UCL"). Therefore, the §§ 17500 and 17200/unlawful claims are dismissed for failure to plead actual reliance by 23.
However, this analysis does not apply to the § 17200 claim to the extent it simply alleges an unfair act or practice. Unfairness is measured on a standard different from fraud - a defendant competitor's misrepresentation can be unfair even if the plaintiff itself was not deceived by the misrepresentation. See Van Slyke v. Capital One Bank , No. C 07-00671 WHA, 2007 WL 3343943 at *10, 2007 U.S. Dist. LEXIS 82690 at *31 (N.D. Cal. Nov. 7, 2007) (noting that, in a § 17200 case brought by a plaintiff against a competitor (i.e. , not a consumer case), unfairness relates to actual or threatened impact on competition); Cel-Tech Comm'ns, Inc. v. L.A. Cell. Tel. Co. , 20 Cal. 4th 163, 186-87, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) (stating that, "[w]hen a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition"); see also In re Tobacco II Cases , 46 Cal. 4th 298, 325 n.17, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009) (noting that "[t]here are doubtless many types of unfair business practices in which the concept of reliance, as discussed here, has no application"). This aspect of § 17200 focuses on unfair competition.
The Court acknowledges that there are some cases that arguably hold to the contrary. See, e.g. , Thomas v. Costco Wholesale Corp. , No. 5:12-CV-02908-EJD, 2014 WL 1323192 at *5, 2014 U.S. Dist. LEXIS 46405 at *14 (N.D. Cal. Mar. 31, 2014) ("The California Supreme Court has held that the phrase 'as a result of' in UCL section 17204 'imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong.' This also applies under the UCL's 'unlawful' and 'unfair' prong, where the predicate unlawfulness is misrepresentation and deception.");
*912 McNeary-Calloway v. JP Morgan Chase Bank, N.A. , 863 F.Supp.2d 928, 959 (N.D. Cal. 2012) (Spero, J.) ("Although In Re Tobacco concerned a claim only under the fraudulent prong, it has been held that, under any prong, a UCL claim that is based in fraud must be supported by allegations of reliance in order to properly be pled."). To the extent they so hold, the Court respectfully disagrees with their analysis.
4. Relief
Finally, Ancestry argues that, even if its arguments on Rule 9(b) and standing are not successful, there is one more independent basis for dismissal - i.e. , the relief that 23 seeks is not recoverable. Ancestry notes, that per the complaint, the specific relief 23 seeks for the §§ 17500 and 17200 claims includes (1) disgorgement of profits and (2) restitution.
Ancestry is correct that, to the extent 23 seeks nonrestitutionary disgorgement of profits, that relief is unwarranted because §§ 17500 and 17200 allow only for restitution.
As for restitution, Ancestry persuasively argues that, on the face of the complaint, it is not plausible that there is any restitution to be had. "[A]n order for 'restitution' [is] one 'compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property.' " Korea Supply Co. v. Lockheed Martin Corp. , 29 Cal. 4th 1134, 1144-45, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). In the case at bear, the §§ 17500 and 17200 claims, as pled, are based on misleading advertising only. 23 nowhere alleges in its complaint that Ancestry obtained any money or property from 23 through its misleading advertising. Thus, there is no basis for restitution.
23 suggests, in its opposition brief, that Ancestry should have to disgorge any profits it made from its patent infringement, see Opp'n at 21-22 (arguing that 23 has an "ownership interest in the DNA tests offered by Defendants (in that the DNA tests embody [23's] intellectual property)"), but, as noted above, the §§ 17500 and 17200 claims, as pled, are not based on patent infringement but rather only misleading advertising. In any event, as held herein, 23 fails to state a patent infringement claim.
Accordingly, to the extent 23 has asked for disgorgement of profits and restitution, its §§ 17500 and 17200 claims are problematic. However, this only counsels in favor of a dismissal (with leave to amend) of the requests for disgorgement and restitution - and not a dismissal of the §§ 17500 and 17200 claims themselves. This is because 23 has also asked for injunctive relief. And on the face of the complaint, nothing indicates that Ancestry has stopped making representations about, e.g. , "5X MORE REGIONS" on its website. Although, in its reply brief, Ancestry claims that "the allegedly misleading statements no longer appear on Ancestry's website," Reply at 13 n.12, that assertion is outside the four corners of the complaint.
5. Summary
With respect to standing, because the §§ 17500 and 17200 claims are predicated on misleading advertising only (and not patent infringement), 23's failure to plead its own actual reliance on Ancestry's alleged misrepresentations warrants a dismissal of the § 17500 claim and the § 17200/unlawful claim. However, the § 17200/unfair claim (even though based on misleading advertising) survives the standing challenge.
As to the § 17200/unfair claim, disgorgement and restitution are implausible remedies.
*913 However, injunctive relief is still a possible remedy - at least based on what the complaint alleges (i.e. , there is no allegation that Ancestry has ceased making misrepresentations on its website).
For the § 17200/unfair claim, 23 has pled to satisfy Rule 9(b), except with respect to the March 29, 2018, representation on Ancestry's website. As above, 23 has leave to amend to cure this specific deficiency. If 23 amends, then it should address whether injunctive relief is proper if, in fact, Ancestry has ceased making misrepresentations on its website.
E. Declaratory Relief Claims (Ancestry's Trademark)
1. Relevant Background
Ancestry has a registered trademark in the word mark "Ancestry." See Compl., Ex. 10 (trademark). According to 23, Ancestry has claimed 23's use of the word " 'Ancestry' in certain of [23's] advertising and on certain of [23's] products" causes consumer confusion. Compl. ¶ 70; see also Compl. ¶ 75 (alleging that Ancestry has "contended that [23's] use of the phrase 'Ancestry Service,' 'Health + Ancestry Service,' or use of the word 'Ancestry' under 'Your information' or 'Find out what your DNA says about your health, traits and ancestry' " infringes). 23 asks for a declaratory judgment that it does not infringe because, e.g. :
• 23 "has priority of usage of the mark as to the DNA testing market," Compl. ¶ 73 (adding that, when Ancestry registered the word mark, "the mark was to market genealogical periodicals and genealogy websites, not ... DNA testing services"); and
• 23 uses the word "Ancestry" to "generically describe[ ] the characteristics of the service" it provides and thus its usage "constitutes fair use." Compl. ¶ 77.
23 also asks for a declaration that Ancestry's trademark is invalid because "Ancestry" "has become generic for genetic testing for ancestry information and genealogical research services." Compl. ¶ 81.
Ancestry's main argument is that the declaratory relief claims should be dismissed for lack of subject matter jurisdiction - more specifically, because there is no case or controversy (Article III) or actual controversy (the Declaratory Judgment Act) for the Court to adjudicate. Because this is a 12(b)(1) motion to dismiss, both parties have provided evidence as to whether there is, in fact, a case or controversy. The evidence provided indicates as follows.
From January to April 2017, 23 and Ancestry communicated regarding 23's use of the term "Ancestry." On April 20, 2017, Ancestry provided 23 with an initial draft of an agreement regarding 23's use of the term. See Chenhansa Decl. ¶ 3. Thereafter, the parties continued to negotiate the terms of the agreement through February 2018. See Chenhansa Decl. ¶ 4.
On March 1, 2018, Ancestry proposed an edit to the agreement. See Chenhansa Decl. ¶ 5. On April 30, 2018, 23 responded that it would accept that edit but then proposed its own edit to the agreement. 23 then stated: "Please finalize the agreement, have it executed by your client, and then send it to us for final review and execution by [23]." Chenhansa Decl. ¶ 7 & Ex. 5 (email). On May 1, 2018, 23 proposed another edit to the agreement and stated: "Please make that revision or contact me if you wish to discuss." Chenhansa Decl. ¶ 8 & Ex. 6 (email).
On May 11, 2018, Ancestry rejected the proposed edits and asked 23 to "revisit and let me know if you will withdraw" the *914 proposed edit. Haggarty Decl. ¶ 4 & Ex. A (email).
Thereafter, on that same day, 23 filed the instant lawsuit.
2. Case or Controversy
Title 28 U.S.C. § 2201 provides in relevant part that, "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).
The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.
Md. Cas. Co. v. Pac. Coal & Oil Co. , 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941) ; see also MedImmune, Inc. v. Genentech, Inc. , 549 U.S. 118, 127, 137, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (affirming Maryland Casualty test in a case where patent licensee sought declaratory judgment that patent was invalid, unenforceable, or not infringed; holding that licensee was not required to break or terminate license agreement before seeking declaratory judgment).[10] To state the matter somewhat differently, "[a] case or controversy exists justifying declaratory relief only when the challenged ... activity ... is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the ... parties." Bayer v. Neiman Marcus Grp. , 861 F.3d 853, 867 (9th Cir. 2017) (internal quotation marks omitted). "The requirement that a case or controversy exist under the Declaratory Judgment Act is 'identical to Article III's constitutional case or controversy requirement.' " Principal Life Ins. Co. v. Robinson , 394 F.3d 665, 669 (9th Cir. 2005).
In the instant case, the parties had a disagreement about 23's actual use of the term "Ancestry." They never reached an agreement regarding 23's use. Hence, the case or controversy requirement is satisfied. Compare, e.g. , Merit Healthcare Int'l, Inc. v. Merit Med. Sys. , 721 F. App'x 628, 629 (9th Cir. 2018) (No case or controversy where "the Original Complaint indicates that, despite the similarity of marks and similarity of goods, the parties have coexisted for thirty years without any apparent conflict. Moreover, the Original Complaint contains no allegation that Merit Medical has any plan to alter the status quo."). The Court notes that, before the Supreme *915 Court's MedImmune decision, "Ninth Circuit precedent required a plaintiff in a trademark case to demonstrate a 'real and reasonable apprehension that [it] will be subject to liability.' " Homie Gear, Inc. v. Lanceberg Holdings, LLC , No. 16cv1062 BTM (DHB), 2016 WL 6804611, at *2, 2016 U.S. Dist. LEXIS 159750, at *5 (S.D. Cal. Nov. 16, 2016) (citing Chesebrough-Pond's, Inc. v. Faberge, Inc. , 666 F.2d 393, 396 (9th Cir. 1982) ). But MedImmune held the reasonable-apprehension-of-suit test as simply one way that the " 'declaratory judgment plaintiff can satisfy the more general all-the-circumstances test to establish that and action presents a justiciable Article III controversy.' " Id. In any event, even if the reasonable-apprehension-of-suit test were given more weight, the Ninth Circuit has indicated that, where a "plaintiff is engaged in the ongoing [use]" of the disputed intellectual property, "the showing of real and reasonable apprehension beyond the [use] need not be substantial." Societe de Conditionnement en Aluminium v. Hunter Eng'g Co. , 655 F.2d 938, 944 (9th Cir. 1981) (patent infringement case).
Ancestry contends that there is no case or controversy because, even though no contract was actually signed , the parties had, through their negotiations, reached agreement on most terms of use and the only places where they did not have agreement [Redacted] See Reply at 14 [filed under seal] . More specifically, in its complaint, 23 alleges: "[Ancestry has] contended that at least [23's] use of the phrase 'Ancestry Service,' 'Health + Ancestry Service,' or use of the word 'Ancestry' under 'Your information' or 'Find out what your DNA says about your health, traits and ancestry,' somehow uses its 'Ancestry' trademark." Compl. ¶ 75. Ancestry asserts that the parties had reached agreement that [Redacted] Chenhansa Decl., Ex. 4 (§ 1 of the draft agreement) [filed under seal] .
There are several problems with Ancestry's argument. First, in the absence of a signed contract, it is not clear that 23 was (or is) willing [Redacted] [filed under seal] . Second, the allegation in the complaint covers [Redacted] [filed under seal] . Finally, Ancestry's attempt to characterize the agreement above (§ 1 in the draft contract) as dispositive fails to take into account that that the parties had a disagreement about a related term (§ 5 in the draft contract), which rendered that purported agreement questionable. See Chenhansa Decl., Ex. 4 (§ 5 of draft agreement) [Redacted] [filed under seal] ; Chenhansa Decl., Ex. 5 (email from 23) [Redacted] [filed under seal] ; Chenhansa Decl., Ex. 6 (email from 23) [Redacted] [filed under seal] ; Haggarty Decl., Ex. A (email from Ancestry) (stating that "[w]e have a problem with these proposed [edits]" [Redacted] [filed under seal] . There remains a case or controversy sufficient to support 23's claim for declaratory relief.
3. Discretion
Finally, Ancestry argues that, even if this Court has subject matter jurisdiction over the declaratory relief claims, it should exercise its discretion and not entertain them. Ancestry cites EMC Corp. v. Norand Corp. , 89 F.3d 807 (Fed. Cir. 1996), a case where the plaintiff sought a declaration that it did not infringe certain patents and that the patents were invalid. The district court exercised discretion not to entertain the declaratory relief claims. On appeal, the Federal Circuit rejected the plaintiff's argument that it is an "abuse of discretion for a district court to dismiss a declaratory judgment action except when special circumstances are present." Id. at 814. "Rather, we heed the Supreme Court's instruction that special flexibility is *916 called for in the declaratory judgment context, where 'the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.' " Id. The court therefore deemed it appropriate for the district court to consider "whether hearing the declaratory judgment action would serve the objectives for which the Declaratory Judgment Act was created." Id. The district court had declined jurisdiction on the ground that "allowing the declaratory judgment action to proceed would 'create an incentive structure that is inconsistent with the public interest in preserving declaratory proceedings for cases closer to the central objectives of declaratory proceedings.' " Id. In other words, "a party in [the plaintiff's] position could abuse the declaratory judgment device to obtain a more favorable bargaining position in its ongoing negotiations with the patentee and also to undermine the value of the patent so as to impede its sale or licensing to a third party." Id. The district court also indicated that discretionary dismissal was justified on the basis that allowing the claim to go forward would be inconsistent with the policy of promoting extrajudicial dispute resolution and conservation of judicial resources. In that case, declaratory relief was sought during active negotiations. It was in this context that the Federal Circuit stated:
We agree that a court may take into account the pendency of serious negotiations to sell or license a patent in determining to exercise jurisdiction over a declaratory judgment action. While a court may conclude that ongoing negotiations do not negate the presence of a controversy for jurisdictional purposes, the court may nonetheless find ... that the need for judicial relief is not as compelling as in cases in which there is no real prospect of a non-judicial resolution of the dispute.
Id.
Of course that a court may take into account serious negotiations does not mean that the existence of such negotiations require dismissal of the declaratory relief claims. Moreover, in the instant case, it is not even clear that there are serious ongoing negotiations. While the parties have engaged in negotiations for a significant period of time (since January 2017), they still have not been able to reach an agreement after all that time. This suggests that the parties have reached a serious stumbling block in their negotiations.
Finally, 23 fairly makes the point that judicial economy would be served by putting in one lawsuit all of the parties' disputed intellectual property rights. See Opp'n at 25.
The Court therefore, in the exercise of its discretion, declines to dismiss the declaratory relief claims.
II. CONCLUSION
For the foregoing reasons, Ancestry's motion to dismiss is granted in part and denied in part. 23 has leave to amend as provided for in this order. Any amended complaint shall be filed no later than September 24, 2018.
This order disposes of Docket No. 29. This order shall be filed under seal.
IT IS SO ORDERED .

However, 23 does not assert infringement of claim 26 in the instant case.

The use of the term "Inheritance by Descent" appears to be an error. Rather, the correct term is "Identical by Descent."

Of course, even though preemption concerns are "the basis for the judicial exceptions to patentability ..., the absence of complete preemption does not demonstrate patent eligibility." Ariosa Diagnostics, Inc. v. Sequenom, Inc. , 788 F.3d 1371, 1379 (Fed. Cir. 2015).

"If a law of nature is not patentable, then neither is a process reciting a law of nature, unless that process has additional features that provide practical assurance that the process is more than a drafting effort to monopolize the law of nature itself." Mayo , 566 U.S. at 77, 132 S.Ct. 1289.

The system and computer program product described in claims 31 and 37 involve generic computer components. Under Alice , the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." Alice , 134 S.Ct. at 2358 (adding that, "[g]iven the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional feature[ ]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself").

The Court acknowledges Ancestry's contention that the patent claims at issue are directed to an abstract idea - i.e. , comparing similarities between DNA, similar to the situation in BRCA . However, the Court need not reach the question whether BRCA additionally justifies a finding that step one is satisfied. The Court finds it more appropriate, in the instant case, to consider the act of comparing at step two of the Alice test.

Claim 8 refers to use of a distribution pattern, but 23 does not claim to have applied a novel distribution pattern.

Compare Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd. , 887 F.3d 1117, 1134 (Fed. Cir. 2018) (finding claims patent eligible; distinguishing Mayo on the ground that "the claims in Mayo were not directed to a novel method of treating a disease" but rather "were directed to a diagnostic method based on the 'relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm' ").

To the extent Plaintiffs argue that the Court should not find patent ineligibility here because there is no danger that basic building blocks of scientific research will not be monopolized, the Court is not persuaded. "While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." Ariosa , 788 F.3d at 1379. Moreover, " '[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment....' " Intellectual Ventures I LLC v. Erie Indem. Co. , 850 F.3d 1315, 1330 (Fed. Cir. 2017).

In MedImmune , the Supreme Court questioned the Federal Circuit's reasonable-apprehension-of-suit test. See, e.g. , MedImmune , 549 U.S. at 132 n.11, 127 S.Ct. 764. Following MedImmune , the Federal Circuit stated that,
[w]hile the Supreme Court rejected the reasonable apprehension of suit test as the sole test for jurisdiction, it did not completely do away with the relevance of a reasonable apprehension of suit. Rather, following MedImmune , proving a reasonable apprehension of suit is one of multiple ways that a declaratory judgment plaintiff can satisfy the more general all-the-circumstances test to establish that an action presents a justiciable Article III controversy.
Prasco, LLC v. Medicis Pharm. Corp. , 537 F.3d 1329, 1336 (Fed. Cir. 2008).